Filed 2/23/15  P. v. Merenda CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>DARREN JACK MERENDA,<br><br>    Defendant and Appellant. | F065569<br><br>(Super. Ct. No. 1408049)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Stanislaus County.  Dawna F. Reeves, Judge.

Marilyn G. Burkhardt, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Catherine Chatman and R. Todd Marshall, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## *INTRODUCTION*

In the early morning hours of September 12, 2009, defendant Darren Jack Merenda stabbed Donald Futch 11 times with a knife, causing Futch's death. On October 11, 2011, a jury found defendant guilty of deliberate and premeditated murder in violation of Penal Code section 187, subdivision (a).[1] Defendant was sentenced to 25 years to life.

On appeal, defendant contends he was denied his Sixth Amendment right to counsel of choice when, approximately two weeks prior to the start of trial, his newly retained private counsel appeared in court and sought a trial continuance indicating he had just been retained and would not be ready for trial. The trial court denied the continuance principally because the prosecution represented it had a "critical witness" (Peter Delacruz) under state subpoena who was serving in the Army in Afghanistan and the Army would transport Delacruz to trial in two weeks. However, after the court denied the continuance, and before the jury was sworn, the Army informed the prosecution team that its state subpoena was insufficient to compel Delacruz's trial attendance, which the prosecutor failed to disclose to the court or defense. Prior to the jury being sworn, defendant's appointed counsel also informed the court and the prosecutor that Delacruz was critical to the defense, but the defense never subpoenaed Delacruz for trial.

Defendant contends the prosecutor committed misconduct and his appointed trial counsel rendered ineffective assistance. Defendant claims, inter alia, the prosecutorial misconduct caused the trial court to deny the continuance, which violated his Sixth Amendment right to counsel of choice.

Although we decline to find prosecutorial misconduct as defendant urges, we are persuaded that prosecutorial error occurred in regards to the erroneous representations

---

[1] All future statutory references are to the Penal Code unless otherwise noted.

given to the trial court which, in large part, caused the trial court to deny the requested trial continuance, which denied defendant his counsel of choice. Because we find prosecutorial error implicating defendant's Sixth Amendment right to counsel of choice, we reverse defendant's conviction and remand for a new trial.

## *FACTUAL BACKGROUND*

In May 2009, defendant began dating Brooke Barker, who lived in an apartment downstairs from defendant's apartment. Barker broke off the intimate relationship with defendant in June 2009, and she became romantically involved with Futch the following month.

On September 12, 2009, sometime after midnight, defendant happened to see Barker and Futch at a local bar. As he walked past Barker inside the bar, defendant reached out his hand to her, but she did not see him. Barker and Futch returned to her apartment sometime between 1:30 and 2:00 a.m. Defendant returned to his apartment sometime around 1:45 or 1:55 a.m.

Once home, defendant continued to drink and he texted Barker at 2:30 a.m., saying it was good to see her. He did not get a response and texted her again at approximately 3:29 a.m. asking why she did not shake his hand at the bar that night.

Defendant did not realize that Futch was with Barker in her apartment. At approximately 3:34 a.m., Futch sent a text message to defendant on Barker's cell phone, stating: "This is [Futch]. Shut the fuck up, dumb ass." Approximately eight minutes later, defendant texted back, "[Futch]—I'm not so dumb." Within seconds, Futch called defendant using Barker's cell phone and told defendant to "get [his] ass downstairs" because he wanted to talk.

Defendant was alarmed but felt he had to go down and talk to Futch to smooth things over. He got dressed and put a sheathed knife in the pocket of his cargo shorts. He felt that Futch might try to hurt him and he took the knife to either scare Futch or defend himself. Although Futch had never threatened defendant before, Barker had

3.

previously threatened to "sic" Futch on him and defendant also believed Futch was a cage fighter.

Before going downstairs, defendant woke his roommate, Delacruz,[2] and told Delacruz he was going to talk with Futch and he would call for Delacruz if he needed help.

Once downstairs, defendant saw Futch and Barker waiting for him in front of Barker's apartment on the ground floor. Futch met defendant at the foot of the stairs while Barker remained near her porch. After an exchange of words, Futch told defendant to follow him to an alley across the carport so they could talk without Barker hearing. Futch walked towards a dumpster near the alley and defendant followed him about five paces behind while Barker remained near her apartment watching.

As Futch approached the corner to the alley, Barker saw him flipping open a pack of cigarettes and he was looking down at them as he went around the corner. Just as she lost sight of Futch turning the corner, Barker saw defendant raise his right hand above his head, holding a knife. She saw defendant move towards Futch. Both men disappeared from Barker's view. Barker ran to the alleyway, arriving in five seconds, and witnessed defendant stabbing Futch as Futch slumped to the ground.

Defendant was covered in blood and Barker yelled, "What did you do?" as she tried to rouse Futch. Defendant started walking around in circles saying, "What did I do? What did I do?" Defendant threw the knife, which was recovered in a backyard behind the alley and across the fence line. Defendant's knife was covered with Futch's blood and the tip was bent over approximately a quarter of an inch. Futch's blood was also found on the cargo shorts defendant wore that morning.

---

**2**     We adopt the spelling "Delacruz" in conformity with the spelling set forth in the parties' respective briefing. The reporter's transcript spelled this name various ways, including "Dela Cruz," "De La Cruz," and "DeLaCruz."

Defendant ran to his apartment. He testified at trial that he knew he did something wrong so he decided to shoot himself with a rifle he owned. In his bedroom, defendant loaded a shell into the rifle, but it jammed in the chamber. Delacruz intervened, took the rifle from him and helped him into the kitchen, where defendant collapsed.

Futch died due to blood loss from 11 stab wounds to his chest and extremities. The two deepest stab wounds to Futch's chest were 12 and 13 inches deep. The 13 inch wound penetrated and dissected Futch's heart. Futch also sustained lacerations to both lungs. One of the wounds to Futch's left arm penetrated completely through the arm. The wound to Futch's left thigh showed the knife was twisted after it entered his leg.

The sheath to defendant's knife was located in a flowerbed between Barker's apartment and the alleyway. The sheath was discovered about 10 to 15 feet from the bottom of the stairs where defendant and Futch first met that morning. Defendant would have passed the flowerbed on his way to the dumpster with Futch. No blood was on the sheath.

Police interviewed defendant later that morning and defendant said he was in love with Barker, who decided to separate from him. He told police Barker ignored his text messages on the night in question, which he found "a bit presumptuous."

Defendant testified at trial it was Futch who initiated the violence, lunging at him, grabbing him, and hitting him before he took out his knife. Defendant did not have any injuries other than scrapes to his knees. Futch did not have a weapon with him and police only located a pack of cigarettes and a lighter in the alley where Futch died.

Defendant's blood alcohol level was 0.18 percent as of 6:39 a.m. on September 12, 2009.

## *PROCEDURAL HISTORY*

Because of the importance of the procedural history, we set forth in some detail the court proceedings occurring from September 12 through October 4, 2011.

5.

*Motion to substitute counsel*

On September 12, 2011, two weeks prior to the start of trial, defendant requested replacement of his appointed counsel, deputy public defender Saul Garcia, with retained counsel, Kirk McAllister. McAllister appeared in court, confirmed defendant had just retained him, and requested to vacate the trial date because he could not be ready for trial in two weeks. The prosecutor objected, arguing the trial had been set for a number of months and the prosecutor had a military witness (Delacruz) who was serving in Afghanistan and the Army was bringing him for the trial on September 26, 2011. The court continued the matter until the following day so that the assigned trial judge could rule on the issue.

On September 13, 2011, the prosecutor renewed her objection arguing the case was two years old and there had never been a previous mention or concern about Garcia's representation. The prosecutor noted the case had been previously set for jury trial on February 15, 2011, which was continued for the defense to retain an expert witness. The prosecutor asserted that Delacruz was a "critical prosecution witness" regarding premeditation because he had contact with defendant immediately prior to and immediately after the stabbing. The prosecutor stated Delacruz was personally served in June 2011, the subpoena could be produced, and it appeared Delacruz was avoiding service because he was defendant's friend and did not want to testify. The prosecutor noted that after Delacruz was served, he secured military deployment to Afghanistan but he did not make the Army aware of his personal service for a homicide jury trial.

The prosecutor informed the court that her office had been in contact with the Army and she confirmed that Delacruz was "in transit. He's to be here. He will be present on the 26th of September. If we vacate this jury trial, I no longer have personal service on that witness." She argued Delacruz's location would be unknown once his military assignment ended, and she noted he might be killed in Afghanistan. Delacruz

6.

did not testify at the preliminary hearing. The prosecutor argued it was prejudicial to grant defendant's request.

McAllister argued the Sixth Amendment guaranteed defendant the counsel of his choice and Delacruz could be called off for now and brought back for the reset trial. He noted defendant's right to an attorney of his choice was the overriding factor and the court should allow him to substitute in and then arrange a trial date that "would guarantee my readiness."

The court asked Garcia if he was prepared for trial and Garcia indicated he was. The court recessed until September 15, 2011, to review the matter.

### A Marsden[3] hearing takes place on September 15, 2011

On September 15, 2011, McAllister began the proceeding by informing the court that defendant had a sealed statement relating to the change in counsel. The court reviewed defendant's statement and determined it required a hearing pursuant to *Marsden*. The court cleared the courtroom except for defendant, McAllister, Garcia and court personnel.

During the closed hearing, defendant expressed dissatisfaction with Garcia's representation, accusing Garcia of missing appointments, failing to provide him with complete discovery, and failing to follow up with evidentiary investigations. Regarding the delay in hiring McAllister, defendant explained his family was searching for private representation for him and surprised him after finally raising sufficient funds, a task they started soon after he was arrested.

Garcia responded to defendant's complaints and explained his criminal law experience and his preparations for trial. Garcia noted defendant had asked him the week prior about getting a trial continuance because defendant did not know "what was going on completely." Garcia told defendant a continuance was unlikely unless something

---

[3]     *People v. Marsden* (1970) 2 Cal.3d 118 (*Marsden*).

7.

substantial came up, such as Delacruz not appearing for trial. Garcia informed the trial court that Delacruz was "a critical witness for both [the] People and us. [The] People are going to say what he saw, you know, suggests premeditation. We're going to say the opposite. What he saw, shows in fact, [he] wasn't premeditating[,] [he] wasn't planning on fighting."

The court asked Garcia if he was ready for trial and Garcia indicated he was ready. The court denied the request to replace Garcia as defendant's attorney, determining Garcia had represented defendant for two years and the file indicated no previous dissatisfaction of that representation, including no previous request for a *Marsden* hearing or that defendant was attempting to hire private counsel. The court noted Garcia was ready and the prosecution faced prejudice "due to related, unusual witness availability issues that are particular to this case." The court determined that substitution of counsel "would create disruption in the orderly processes of justice, … and an undesirable delay in the trial date that will result in significant prejudice to the People's ability to prosecute the charged offense. Motion to continue the trial date is denied." The trial court informed McAllister he could substitute in as counsel of record if he could be prepared to proceed to trial in two weeks, which McAllister said would not be possible. The court stated Garcia was attorney of record and the trial date was confirmed.[4]

### *A second Marsden hearing takes place on September 26, 2011*

On the morning of September 26, 2011, the first day scheduled for trial, defendant renewed his request to relieve Garcia as his attorney of record. The court conducted a

---

[4] On September 20, 2011, defendant, by and through McAllister, filed in this court a petition for writ of prohibition and stay of proceedings (the Writ) in case No. F063308. Attached to the Writ as exhibits were the complete reporter's transcripts from the hearings on September 12, 13, and 15, 2011. The Writ sought, inter alia, a stay of the criminal proceedings, a continuation of the jury trial date, and to allow McAllister to substitute in as attorney of record. Defendant argued, inter alia, his Sixth Amendment right to counsel of choice was violated. On September 21, 2011, this court denied the Writ without comment.

8.

second *Marsden* hearing, wherein defendant indicated he had an inability to communicate with Garcia, and continued to accuse Garcia of inadequate trial preparation. Defendant stated Garcia was not the lawyer he wanted.

Garcia responded to defendant's concerns and explained his preparations for trial. The court asked Garcia to give a summary of the expected evidence, which he did. The court asked if the witness coming from out of town, Delacruz, saw the actual event. Garcia represented Delacruz did not see the stabbing, but defendant woke up Delacruz that morning saying something like, "[I]f I call you out, that means I need help" or "if I call you, come get me for help." Garcia explained that Delacruz went to the window, trying to stay awake, but did not know what was going on. Delacruz heard some screams, yelling and then defendant came back to the apartment with blood on him.

The court asked if Garcia could continue representing defendant, and Garcia indicated he could. The court denied defendant's motion to relieve Garcia, noting Garcia knew the case and was ready to proceed. The court stated defendant had the right to a lawyer of his choice, but the prosecution faced prejudice based on the "witness issue" and their right to a speedy trial.

Defendant asked the court if the witness coming from Afghanistan was the issue causing unfair prejudice for the prosecution, and the court stated, "That, and some other things." The court stated the prosecution has "been waiting for two years; they've been juggling all these different witnesses, including the one from Afghanistan, and they have the burden of proof. So I can't just disregard their rights in favor of yours." The court further stated that normally in this situation, defendant would be able to substitute the new attorney and continue the trial date, but they were close to trial "and the People have already put in motion a number of things to be prepared to go forward on this case." The court noted it would not be fair to the People to let defendant disrupt everything now and defendant's proffered reasons were insufficient to put the prosecution at a disadvantage.

Defendant informed the court its ruling was helping the prosecution and making it more convenient for them. The court stated defendant was not in a position to say that and the witness from Afghanistan "may or may not be available to [the prosecution] once this trial date is not available. That's what they represented was the difficulty in finding him in the past. And beyond that one witness, they have other witnesses they have to line up for this court date, and they also have the right to a speedy trial, like I've been telling you, that I have to consider."

### *Defendant seeks a mistrial*

On September 26, 2011, jury voir dire commenced. At 4:09 p.m., the prosecutor stated she wanted to preserve jurisdiction on two witnesses, one of which was Delacruz.[5] The prosecutor stated the last information from the Army was that Delacruz was "in country" and that was all she knew. The prosecutor asked for a bench warrant to be issued but stayed until the following morning, which the court granted without objection from the defense.

The following morning, at approximately 9:48 a.m., the prosecutor asked for Delacruz's bench warrant to issue, stating she had no direct contact with him. The court ordered Delacruz's bench warrant to issue at 10:00 a.m. and voir dire resumed.

On September 28, 2011, the jury was sworn and both sides made opening statements. The prosecutor did not mention Delacruz in her opening statement, but Garcia informed the jury that Delacruz was defendant's roommate, he was a veteran coming from Afghanistan to testify, and defendant woke him up on the morning of the incident saying something like, "Hey, if I call you, that means I need your help."

After opening statements, the prosecutor called Barker, who testified for the rest of the morning session. At 11:55 a.m., the court recessed for lunch.

---

[5] The other witness was Rebecca Lynn, who contacted the prosecutor later that same day and personally appeared in court on September 27, 2011.

10.

At 1:32 p.m., Garcia made a motion for a mistrial. Garcia argued the prosecutor was "disingenuous" in failing to inform him that they did not have Delacruz secured as a witness as of that day. Garcia trusted the prosecutor's representation and trusted her "silence" on the issue as meaning she had no doubt Delacruz was going to be brought in. He did not realize this was an issue until the prosecutor did not mention Delacruz in her opening statement. He stated he asked her as they broke for lunch if the prosecution had Delacruz, and the prosecutor said, "No" and "casually dismissed it," saying to him "I don't know why you brought it up in opening statement. You're the one that exposed yourself to error. I told you the warrant went out."

Garcia argued it would be "fundamentally unfair" to proceed with the trial because the entire basis for the court's previous denial was due to this "critical witness" only being available "through great effort of getting him from Afghanistan. We both concurred that this was a critical witness, Your Honor. And I've already promised him to the jury and I've already created, I think, irreconcilable error to get that—I can't get that corrected if he doesn't come back." Garcia asserted defendant's statement to Delacruz, "If I call you, back me up," was the key evidence for the defense to negate premeditation.

Garcia stated he accepted the prosecutor's representations she was "going to do everything she could to get [Delacruz] here." He argued the prosecutor had assured him and kept him apprised from August 16, 2011, until the trial regarding efforts to get Delacruz from Afghanistan. Garcia noted the prosecutor could have told him that Delacruz was "[his] witness" and stopped trying to get him, and he would have sought a continuance to secure his presence, but it was not until the hearing on the continuance motion that the prosecutor first described Delacruz as an evasive witness. Garcia emphasized Delacruz was the main reason why the prosecutor opposed the motion for continuance, but that reasoning was false as she did not need Delacruz for the trial. Garcia noted he "absolutely would have moved for a continuance" upon learning Delacruz was not secured before the jury was sworn.

11.

The prosecutor responded that she never misrepresented to the court or Garcia anything about Delacruz. She stated they had "endeavored to get [Delacruz] here at every corner," including a telephone call the day before with the Staff Judge Advocate. She noted Garcia was present when she asked for a bench warrant to issue for Delacruz so she did not understand how Garcia would think she had secured Delacruz for trial. She stated she told Garcia the day before that she had not spoken with Delacruz, had not seen him, and was asking for a bench warrant for him. She argued they personally served Delacruz, and the Army told her investigator that they would get Delacruz there.

Garcia again argued the "crux" of the prosecution's denial to a continuance was this "critical witness" who was now not available, but the prosecution was moving forward. Garcia called the prosecution's opposition "disingenuous" and argued defendant was now forced to go to trial without the attorney of his choice and without a critical witness. He argued going forward would be "fundamentally unfair" and represented that he previously had "countless conversations" with the prosecutor in which he made it clear Delacruz was critical to the defense.

The court asked the prosecutor about the current status of Delacruz. The prosecutor stated the last information she had was from yesterday and a message from the Staff Judge Advocate indicating it was up to Delacruz's commander "whether or not he would be released to be here." The prosecutor's investigator was attempting to get contact information for Delacruz's commander.

The court noted Delacruz was under subpoena and understood the Army was delivering him. The court stated the motion for continuance would not have been different because the information presented to her then had not changed. The court observed that the prosecutor still expected Delacruz to appear sometime during the trial, but he had not yet been obtained. The court did not see grounds for a mistrial because Delacruz was still under subpoena and the prosecutor was still trying to get him. The court also did not see any misconduct because she did not hear that defendant did not

12.

want to go forward without Delacruz, whom the court thought was a prosecution witness, but the prosecution was willing to go forward.

### *The prosecution's efforts to bring Delacruz to trial*

On October 3, 2011, the fifth day of trial, the prosecutor told the court that she informed Garcia "last week" the prosecution was trying to get a federal warrant for Delacruz, and her investigator spoke with Delacruz in Kuwait. Delacruz was willing to come back and his commander was willing to let him come back so they were working to arrange transport.

On October 4, 2011, the prosecutor informed the court it looked "less and less" likely Delacruz would appear for trial because her investigator told her that day over the lunch hour that it was unconfirmed Delacruz had even left Kuwait. The prosecutor noted Delacruz had indicated he was waiting "for the official word" and she believed Delacruz had been "playing games" with the prosecution from the beginning. The prosecutor asked for an opportunity to present her investigator as a witness to prove their diligence in securing Delacruz's presence, which the court permitted outside the presence of the jury.

### *Investigator Steven Jacobson's testimony*

On October 4, 2011, Steven Jacobson, a senior detective with the Stanislaus County District Attorney's Office, testified about his efforts to secure Delacruz. Sometime in the middle of August 2011, the prosecutor asked Jacobson to get Delacruz to the trial as a witness. Starting in August 2011 and continuing until the eve of trial, the Army gave assurances that Delacruz would be available.

However, on September 26, 2011, the Army referred Jacobson to the Staff Judge Advocate, who informed him the Army would not force Delacruz to return in the absence

13.

of a federal subpoena.[6] At that point, the prosecution tried to get a federal subpoena through the United States Attorney's Office and the FBI, but they were unable to secure one.

Jacobson worked to secure Delacruz on a daily basis after the trial started. On September 30, 2011, Jacobson communicated directly with Delacruz in Kuwait through email and Delacruz left a message for Jacobson, indicating his commander would allow him to return for trial.

However, on October 3, 2011, the day before Jacobson's testimony, Jacobson confirmed with Delacruz that he was still in Kuwait. Jacobson understood Delacruz had permission to leave, but needed transportation.

Earlier on the day of his testimony, Jacobson spoke with his Army contact, who informed him that they had not received any responses from Delacruz's commander.

On cross-examination, Jacobson confirmed he first received assurances from the Army on August 29, 2011, that Delacruz would be present for the trial. It never occurred to him that a state subpoena would be insufficient until the Army sent him its regulations

---

**6** Federal agencies, including the United States Department of Defense, are authorized under title 5 United States Code section 301 to promulgate regulations governing the conditions and procedures under which its employees may testify. (*United States v. Soriano-Jarquin* (4th Cir. 2007) 492 F.3d 495, 504; see *FBI v. Superior Court of Cal.* (N.D.Cal. 2007) 507 F.Supp.2d 1082, 1093-1094 [state subpoena invalid to compel attendance and testimony of federal personnel who fall under a valid federal regulation].) These federal regulatory requirements are valid and control over a state subpoena. (*United States ex rel. Touhy v. Ragen* (1951) 340 U.S. 462, 463, 468 [upholding the validity of federal regulations prohibiting release of United States Department of Justice documents pursuant to a subpoena duces tecum after failure to comply with federal regulations].) United States Department of Defense Directive 5405.2 governs, inter alia, the release of Army personnel as a witness in response to a subpoena related to judicial proceedings. (32 C.F.R. § 516.40(a) (2014).) Subpart G of 32 Code of Federal Regulations part 516 (2014) pertains to any request for a witness, including requests by state attorneys in criminal proceedings. (32 C.F.R. § 516.40(a) (2014).) If authorized to appear as a witness, a military member may be granted a pass under Army Regulation 630-5. (32 C.F.R. § 516.55(a) (2014).)

on September 26, 2011. On September 26, 2011, Jacobson was told that Delacruz was "in-country," which Jacobson understood meant Delacruz was still in Afghanistan.[7]

## DISCUSSION

### I. Prosecutorial error caused a violation of defendant's Sixth Amendment right to counsel of choice

#### A. Standard of review

#### Prosecutorial misconduct

"'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process. Conduct by a prosecutor that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the use of deceptive or reprehensible methods to attempt to persuade either the trial court or the jury.'" (*People v. Montes* (2014) 58 Cal.4th 809, 869, quoting *People v. Morales* (2001) 25 Cal.4th 34, 44.) The misconduct must be "'of sufficient significance to result in the denial of the defendant's right to a fair trial.'" (*People v. Ervine* (2009) 47 Cal.4th 745, 806, quoting *United States v. Agurs* (1976) 427 U.S. 97, 108.)

In 1979, "'bad faith'" was abolished as a requirement to establish prosecutorial misconduct. (*People v. Bolton* (1979) 23 Cal.3d 208, 213-214 (*Bolton*); accord, *People v. Hill* (1998) 17 Cal.4th 800, 822.) In creating this new rule, the Supreme Court explained that "this emphasis on intentionality is misplaced. '[Injury] to appellant is nonetheless an

---

**7** On October 6, 2011, defendant, by and through McAllister, filed in this court a petition for writ of mandate (the Writ) in case No. F063449. Attached to the Writ as exhibits were the complete reporter's transcripts from the hearings on September 12, 13, 15, and 28, 2011. The Writ sought, inter alia, a stay of the criminal proceedings and to allow McAllister to substitute in as attorney of record. Defendant argued, inter alia, his Sixth Amendment rights were violated when the prosecutor committed misconduct through untrue factual assertions about the importance of the military witness, which caused the trial court to deny the initial request to substitute counsel and continue the trial date. On October 6, 2011, this court denied the Writ without comment.

15.

injury because it was committed inadvertently rather than intentionally.' [Citations.]" (*Bolton*, *supra*, at pp. 213-214.) *Bolton* has been the law ever since 1979. (*People v. Hill*, *supra*, at p. 822.)

Because bad faith is no longer required, the Supreme Court has noted the term "prosecutorial 'misconduct'" is "somewhat of a misnomer to the extent that it suggests a prosecutor must act with a culpable state of mind. A more apt description of the transgression is prosecutorial error." (*People v. Hill*, *supra*, 17 Cal.4th at p. 823, fn. 1.)

The United States Supreme Court has noted that when specific guarantees of the Bill of Rights are involved, the court has taken "special care to assure that prosecutorial conduct in no way impermissibly infringes them." (*Donnelly v. DeChristoforo* (1974) 416 U.S. 637, 643.) According to the high court, "the touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." (*Smith v. Phillips* (1982) 455 U.S. 209, 219; see *In re Price* (2011) 51 Cal.4th 547, 560 [quoting *Smith v. Phillips*].) "[T]he aim of due process 'is not punishment of society for the misdeeds of the prosecutor but avoidance of an unfair trial to the accused.' [Citation.]" (*Smith v. Phillips*, *supra*, at p. 219.) As such, the inquiry on appeal is the effect of the misconduct on the trial and not the nature or blameworthiness of the misconduct itself, or the prosecutor's character. (*Id.* at p. 220 & fn. 10.)

Prosecutorial misconduct, by itself, does not require a new trial. (*Smith v. Phillips*, *supra*, 455 U.S. at p. 220.) Instead, the effect of the due process violation must be analyzed to determine if prejudice resulted. (*Id.* at pp. 219-220.)

### Sixth Amendment right to counsel of choice

The Sixth Amendment guarantees a criminal defendant the right to assistance of legal counsel. (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144.) A criminal defendant who does not require appointed counsel also has a Sixth Amendment right to the counsel of his or her choice. (*Ibid.*; accord, *People v. Ortiz* (1990) 51 Cal.3d 975, 982 [criminal defendant's right to counsel of his choice is among "the most sacred and

16.

sensitive of our constitutional rights"].)  The United States Supreme Court has long recognized that "a defendant should be afforded a fair opportunity to secure counsel of his own choice." (*Powell v. Alabama* (1932) 287 U.S. 45, 53.)  "In addition, counsel, 'once retained, [must be] given a reasonable time in which to prepare the defense.' [Citation.]  Failure to respect these rights constitutes a denial of due process. [Citations.]" (*People v. Courts* (1985) 37 Cal.3d 784, 790 (*Courts*).)

However, a defendant's right to representation by counsel of choice is circumscribed in some respects.  (*Wheat v. United States* (1988) 486 U.S. 153, 159.) This right can be constitutionally limited if "'it will result in significant prejudice to the defendant himself or in the disruption of the orderly processes of justice unreasonable under the circumstances of the particular case.' [Citations.]" (*Courts*, *supra*, 37 Cal.3d at p. 790.)  A trial continuance in this context is also circumscribed and the trial court has discretion to deny a continuance if the criminal defendant unjustifiably delayed in obtaining new counsel or arbitrarily substituted counsel at the time of trial.  (*Id.* at pp. 790-791.)  However, trial courts should accommodate requests for continuance when it is linked to an assertion of the right to retained counsel of choice "'to the fullest extent consistent with effective judicial administration.' [Citation.]" (*Id.* at p. 791.)  In reviewing a trial court's denial of a continuance, the appellate court looks to the particular circumstances in each case and especially the reasons given to the trial court at the time the continuance was denied.  (*Ibid.*)

When a criminal defendant is unconstitutionally deprived of the right to retained counsel of choice, reversal is mandatory regardless of whether or not the defendant had a fair trial with his appointed counsel.  (*Courts*, *supra*, 37 Cal.3d at p. 796; *People v. Ortiz* (1990) 51 Cal.3d 975, 988; *People v. Gzikowski* (1982) 32 Cal.3d 580, 589.)

**B.    Analysis**

Defendant contends that his Sixth Amendment right to counsel of choice was violated, principally relying on *Courts*, *supra*, 37 Cal.3d 784.  Respondent, however, asserts *Courts* is distinguishable because the trial court here did not abuse its discretion in denying the trial continuance and, as such, the Sixth Amendment was not violated.

In *Courts*, the Supreme Court found reversible error when the trial court refused a trial continuance to allow the defendant to be represented by an attorney he retained approximately one week before trial.  (*Courts*, *supra*, 37 Cal.3d at pp. 787, 796.)  The Supreme Court determined the defendant was diligent in his efforts to secure counsel of his choosing before the date of trial and he alerted the court of his wishes at the earliest possible time.  (*Id.* at pp. 795, 796.)  In finding reversible error, however, the Supreme Court noted there were no circumstances which warranted limiting the defendant's right to counsel based on "judicial efficiency" or any inconvenience to witnesses.  (*Id.* at pp. 794-795.)  The court held that a trial continuance to secure counsel of choice should be accommodated "'to the fullest extent consistent with effective judicial administration.' [Citation.]"  (*Id.* at p. 791.)

Here, when defendant sought a trial continuance, the prosecutor represented that Delacruz was a "critical witness" for the prosecution, he was under subpoena, he was "in transit" from Afghanistan, and he would be present for trial on September 26, 2011.  The prosecutor argued that vacating the trial date could result in losing personal service on Delacruz.  Unlike in *Courts*, the trial court was presented with circumstances that warranted limiting defendant's right to counsel based on "judicial efficiency" and witness availability.  (*Courts*, *supra*, 37 Cal.3d at pp. 794-795.)  *Courts* is distinguishable based on the circumstances presented to the trial court.  In light of the prosecutor's representations, we do not find that the trial court abused its discretion in denying the trial continuance.

18.

However, the trial court's denial of the continuance, which effectively denied defendant's Sixth Amendment right to counsel of his choice, was based on erroneous representations. Delacruz was not a "critical witness" for the prosecution, he was not "in transit" from Afghanistan, and he was not subject to an enforceable subpoena.

Our decision is not predicated on finding that the prosecutor committed misconduct when she opposed defendant's motion for continuance and provided the trial court with representations that proved to be untrue. Prosecutorial error does not require a showing of bad faith or the prosecutor's culpable state of mind. (*Smith v. Phillips*, *supra*, 455 U.S. at p. 219; see *In re Price*, *supra*, 51 Cal.4th at p. 560.) Nevertheless, the due process inquiry requires us to analyze the effect the prosecutorial error had on defendant's constitutional rights. (*Smith v. Phillips*, *supra*, at p. 219; *People v. Hill*, *supra*, 17 Cal.4th at p. 823, fn. 1.) Unfortunately, the prosecutor inadvertently misled the court, which resulted in the denial of the continuance necessary for defendant's counsel of choice to represent him. "The right to counsel of choice is one of the constitutional rights most basic to a fair trial." (*People v. Ortiz*, *supra*, 51 Cal.3d at p. 988.)

Moreover, on September 26, 2011, the prosecutor's investigator was aware that the Army would not recognize the prosecution's subpoena. It is unclear from this record when the prosecutor was made personally aware that the state subpoena was insufficient to compel Delacruz's trial attendance.[8] For purposes of our analysis, however, that is immaterial because a prosecutor is held responsible for the accurate disclosure of potentially exculpatory evidence and "[t]he prosecutor's office is an entity and as such it is the spokesman for the Government." (*Giglio v. United States* (1972) 405 U.S. 150, 154; accord, *In re Brown* (1998) 17 Cal.4th 873, 879.)

---

[8] On October 3, 2011, the fifth day of trial, at about 10:24 a.m., the prosecutor stated in court that she informed Garcia "last week" that the prosecution was trying to get a federal warrant for Delacruz.

The prosecutorial duty of disclosure encompasses a legal obligation to divulge any favorable evidence known to the "'prosecution team,'" which includes information known to investigators. (*In re Brown*, *supra*, 17 Cal.4th at p. 879.) "'The individual prosecutor is presumed to have knowledge of all information gathered in connection with the government's investigation.' [Citations.]" (*Ibid.*) The prosecution has an "'inescapable'" responsibility to disclose all known and favorable evidence that is materially important. (*Id.* at pp. 879-880.) The right to a fair trial is denied when potentially exculpatory evidence is not shared with the defense. (*Id.* at p. 881.)

Here, as of September 26, 2011, and before the jury was sworn on September 28, 2011, the prosecution team knew the Army did not recognize Delacruz's subpoena and Delacruz was still "in country" (meaning in or near Afghanistan). Even if Delacruz was never a "critical witness" for either the prosecution or the defense, Garcia previously made the prosecutor aware he was relying on Delacruz's expected trial testimony to refute premeditation. On September 13, 2011, the prosecutor represented that Delacruz would testify. In light of the circumstances known to the prosecution team, it was error for the prosecutor to not disclose that the Army did not recognize Delacruz's subpoena prior to the jury being sworn.

Instead, on September 26, 2011, during a break in voir dire, the prosecutor informed the trial court and defense counsel that she wanted the court to issue a bench warrant to "preserve jurisdiction" on Delacruz, who was "in country" according to the latest information from the Army. Although we do not believe the prosecutor acted intentionally, the prosecutor's terms caused confusion. Because the prosecutor did not have Delacruz under an enforceable subpoena, there was no "jurisdiction" to preserve, but she implied a valid subpoena was still in effect. Further, although neither the trial court nor defense counsel sought clarification from the prosecutor regarding what she

meant by "in country," it reasonably appears that defense counsel, and perhaps the trial court, believed Delacruz was somewhere in the United States as of September 26, 2011.[9] The prosecutor never made it clear on September 26, 27 or 28, 2011, that Delacruz was not in the United States but, rather, still in or near Afghanistan.

Further, despite respondent's arguments to the contrary, defendant renewed a Sixth Amendment objection on September 28, 2011. During arguments for a mistrial, Garcia noted defendant had been "forced to go to trial without the attorney of his choice," and the prosecution's opposition to the requested continuance was based on the "critical witness" who was not present at trial. Garcia argued he would have moved for a continuance if he knew Delacruz's trial presence was not secured before the jury was sworn.

Respondent asserts it was not the prosecutor's duty to "guarantee" Delacruz's attendance if the defense felt he was critical. Respondent further contends defendant could not establish "good cause" to obtain a trial continuance based on Delacruz's trial absence because the defense was not diligent in issuing a subpoena for Delacruz. (*Owens v. Superior Court* (1980) 28 Cal.3d 238, 250-251.) Finally, respondent maintains it is not proper for defendant to "shift blame" to the prosecution for Delacruz's failure to appear at trial, asserting that the prosecutor's actions after the denial of the continuance, or anything not brought to the court's attention, "are not relevant to the question of the trial court's exercise of discretion."

---

[9] During the September 28, 2011, arguments for mistrial, Garcia noted the prosecutor said Delacruz was "in country," which implied to Garcia that the Army had Delacruz "or somebody's got him." During the October 4, 2011, cross-examination of the prosecutor's investigator, Garcia asked if "in-country" meant "stateside" and the investigator clarified that "in country" meant "in Afghanistan." Defense counsel stated, "Oh, I see" and noted that he "got it backwards." During the mistrial hearing on September 28, 2011, the trial court asked the prosecutor, "Is there any information on what part of the country [Delacruz] is currently in?" The prosecutor stated she did not have that information.

21.

Respondent's arguments, however, fail to consider that the prosecutor successfully opposed the trial continuance largely on September 13, 2011, representations that Delacruz was "critical" for the prosecution, he was "in transit" from Afghanistan, he would be present for the trial on September 26, 2011, and he was under a prosecution subpoena. Although the prosecution was certainly under no duty to secure witnesses for the defense, and although the defense failed to subpoena Delacruz, the prosecutor's representations, when relied upon by the trial court and defense counsel, cannot then be ignored.

Respondent argues Delacruz was never a "critical witness" for the defense, and his nonattendance is irrelevant in determining whether the trial court abused its discretion. Respondent's argument, however, fails to address the impact the prosecutor's representations had on defendant's Sixth Amendment rights. Although we agree that the trial court did not abuse its discretion, the prosecutor's representations on September 13, 2011, and the prosecutor's subsequent failure to fully disclose Delacruz's situation before the jury was sworn, prevented a continuance necessary for defendant to proceed with his counsel of choice.

Indeed, on September 27, 2011, the prosecutor asked the trial court to issue the bench warrant for Delacruz, noting she had no direct contact with him. The trial court instructed her clerk to issue the requested bench warrant at 10:00 a.m. that day, 24 hours before the jury was sworn. Respondent argues the prosecutor's request for a bench warrant "alerted" defendant that Delacruz's attendance was in question and the prosecutor handled the situation "fairly" and without misconduct. Although defendant may have been alerted that Delacruz's trial attendance was in jeopardy, the prosecutor failed to disclose what her office then knew: the Army did not recognize Delacruz's subpoena and Delacruz was still in or near Afghanistan. It was error for the prosecutor to not disclose this material information after making previous representations that the trial court relied upon in denying the continuance.

Moreover, the prosecutorial error was compounded the following day. In denying the mistrial on September 28, 2011, the trial court stated three times that Delacruz was "under subpoena" and noted the prosecution was attempting to obtain his presence for trial. Although it was true the prosecution was still attempting to obtain Delacruz's presence for trial, the trial court continued to labor under the erroneous belief the Army recognized Delacruz's subpoena. The prosecutor's September 13, 2011, representations and ongoing failure to disclose fully Delacruz's situation continued to impact defendant's Sixth Amendment right to counsel of his choice.

Prosecutorial misconduct, by itself, does not require reversal. (*Smith v. Phillips*, *supra*, 455 U.S. at p. 220.) Instead, the effect of the due process violation must be analyzed to determine if prejudice resulted. (*Id.* at pp. 219-220.) In general, where error impacts constitutional rights, the inquiry is whether the error was harmless beyond a reasonable doubt. (*Chapman v. California* (1967) 386 U.S. 18, 24.)

Respondent argues that defendant's motion to continue was properly denied because it was not timely made. On this record, there can be no doubt that the motion to continue was denied, not for being untimely made, but because of the prosecution's insistence on the importance of Delacruz's testimony, and because of its representations that Delacruz was under subpoena and that the power to compel his attendance at trial would likely be lost if the trial date was continued. Based on those facts, the trial court did not abuse its discretion in denying the motion. But those representations turned out to be false: the prosecution successfully prosecuted the case without Delacruz and he was not compelled to appear under an enforceable subpoena.

Having laid the false foundation for the trial court's order denying the continuance motion, which in turn had the effect of denying defendant's right to counsel of his choice, respondent now boldly contends that the trial continuance was properly denied because Delacruz's expected testimony was inadmissible and cumulative to defendant's testimony. Respondent's argument misses the point of what is at stake here. The

prejudice was the deprivation of defendant's right to counsel of his choosing. A denial of one's Sixth Amendment right to counsel of choice is a per se due process violation that mandates a reversal. (*Courts*, *supra*, 37 Cal.3d at p. 790; *People v. Ortiz*, *supra*, 51 Cal.3d at p. 988; *People v. Gzikowski*, *supra*, 32 Cal.3d at p. 589.) As explained in *Courts* at footnote 11 on page 796:

> "At oral argument, the Attorney General strenuously urged this court to find this error harmless under *People v. Chavez* (1980) 26 Cal.3d 334, 348-349. Not only would such a holding contravene well-settled precedent, including a right-to-retained-counsel case decided after *Chavez* (*People v. Gzikowski*, *supra*, 32 Cal.3d at p. 589), but there are sound reasons to decline the invitation. [¶] *Chavez* dealt with the denial of *appointed* counsel of the accused's choice, not retained counsel. The distinction is more than a semantic one. The state has far less reason to interfere with an accused's ability to retain a legal advocate when it plays no part in the appointment process. When the state erroneously infringes an accused's right to appear and defend with retained counsel, considerations as to whether the accused was competently represented by an advocate of the *court's* own choosing become irrelevant. Imposition of any standard short of a per-se reversal would inevitably erode the right itself."

Thus, once it is shown that a defendant's constitutional right to counsel of choice has been violated, reversal is required and there is no further need to assess whether that violation was harmless.

Respondent maintains defendant's retained counsel, McAllister, never stated how much time he needed to prepare for trial, creating an "open-ended delay" justifying denial of the continuance. This argument is unpersuasive because a trial court is required to "'make all reasonable efforts to ensure that a defendant financially able to retain an attorney of his own choosing can be represented by that attorney.'" (*Courts*, *supra*, 37 Cal.3d at p. 790.) Absent the prosecutorial error, it is beyond a reasonable doubt that the trial court would have granted a reasonable continuance to allow McAllister the time he needed to prepare for trial. Moreover, the holding in *Courts* strongly suggests the trial court would have abused its discretion to deny a continuance in the absence of the

24.

prosecution's unusual witness availability issue. (*Id.* at pp. 795-796.) McAllister's failure to disclose how much time he needed to prepare does not alter our conclusion that prosecutorial error resulted in a denial of defendant's Sixth Amendment right to counsel of his choice.

Because defendant was deprived of the right to retained counsel of choice due to prosecutorial error, reversal is mandatory regardless of whether defendant had a fair trial with his appointed counsel. (*Courts, supra,* 37 Cal.3d at p. 796; *People v. Ortiz, supra,* 51 Cal.3d at p. 988; *People v. Gzikowski, supra,* 32 Cal.3d at p. 589.) A criminal defendant does not have to establish prejudice resulting from a Sixth Amendment violation of his right to counsel of choice in order to reverse the conviction. (*People v. Ortiz, supra,* at p. 988.) As our Supreme Court has stated, providing defendant with appointed counsel was not a sufficient Sixth Amendment remedy because defendant's "'constitutional right to counsel entailed more than the presence of a skilled advocate.' [Citation.] Moreover, to assess 'why or how [defendant's] trial was disadvantaged by injecting an undesired attorney into the proceedings would require an impossibly speculative comparison' of [Garcia's] representation with [McAllister's] unrealized performance. [Citation.] 'No appellate court can or should engage in that kind of analysis when such fundamental rights hang in the balance.' [Citation.]" (*Courts, supra,* at p. 796.)

Accordingly, we reverse.[10]

---

**10**    Because we reverse for violation of defendant's Sixth Amendment rights, we do not address defendant's remaining contentions on appeal.

## *DISPOSITION*

The judgment is reversed.  The matter is remanded to the trial court for further proceedings consistent with this opinion.

_____
                                                 Kane, J.

WE CONCUR

_____
Levy, Acting P.J.

_____
Poochigian, J.