**PUBLISHED**

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,

　　　　　　　*Plaintiff-Appellee,*

v.

FRANCISCO SORIANO-JARQUIN, a/k/a
Raul Jarquin,

　　　　　　　*Defendant-Appellant.*

$\left.\right\}$　　No. 05-4962

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(CR-05-276)

Argued: March 16, 2007

Decided: July 11, 2007

Before WILKINSON and TRAXLER, Circuit Judges, and
WILKINS, Senior Circuit Judge.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion,
in which Judge Traxler and Senior Judge Wilkins joined.

---

## COUNSEL

**ARGUED:** Dale Warren Dover, Alexandria, Virginia, for Appellant.
Marla Brooke Tusk, UNITED STATES DEPARTMENT OF JUS-
TICE, Washington, D.C., for Appellee. **ON BRIEF:** Chuck Rosen-
berg, United States Attorney, Stephanie Bibighaus Hammerstrom,
Assistant United States Attorney, OFFICE OF THE UNITED
STATES ATTORNEY, Alexandria, Virginia, for Appellee.

**OPINION**

WILKINSON, Circuit Judge:

Francisco Soriano-Jarquin challenges his conviction for re-entering the United States after deportation in violation of 8 U.S.C. § 1326(a) (2000). The defendant claims that a Virginia State Police officer violated his Fourth Amendment rights by requesting identification from him while he was a passenger in a lawfully stopped vehicle. He also claims that his Fourth and Fifth Amendment rights were violated when the government produced another man, rather than the defendant, at his preliminary hearing, and that his re-indictment after dismissal of his first indictment for clerical error violated his Sixth Amendment right to a speedy trial. Finally, he contends that Department of Homeland Security regulations governing the testimony of agency employees interfered with his attempt to call an immigration agent as a defense witness, in violation of his Sixth Amendment rights to confrontation of witnesses and compulsory process. For reasons that follow, we affirm the judgment of the district court.

I.

On the night of April 12, 2005, a Virginia State Police officer, accompanied by two police trainees, stopped a van with a defective headlight on Interstate 95 in Spotsylvania County, Virginia. Trooper Rodney Ward approached the vehicle and discovered that it also had a cracked windshield and contained an unrestrained infant. In addition to the driver and the front passenger, there were eleven people in the van, including the defendant, Francisco Soriano-Jarquin.

While a police trainee processed the identification of the driver and prepared citations for the broken headlight, cracked windshield, and unrestrained infant, Ward asked the passengers for identification. Although asking for passenger identification is not a requirement of Virginia State Police procedure, Ward asserted that he personally did so as a matter of routine at every traffic stop. When it appeared that the passengers did not understand English, Ward produced his own ID and pointed to it, to communicate that he wished to see their identification. The passengers shook their heads, indicating that they did

not have identification. Ward observed that the passengers appeared to be nervous.

After returning to his vehicle, Ward stated to the police trainee that he was concerned that the passengers might be illegal aliens. At this the driver of the van, who spoke some English, smiled and nodded. When Ward asked him to confirm that his passengers were illegal, he again smiled and nodded. Ward then contacted U.S. Immigration and Customs Enforcement ("ICE"). ICE advised him to take the van off the interstate at the nearest exit and await the arrival of ICE agents.

An ICE agent arrived and spoke to Ward about what he had observed. When the agent interviewed the driver in Spanish, the driver maintained that he did not know anything about the immigration status of the passengers. The agent then spoke to the passenger in the front passenger seat, who stated that he was a second driver of the van and that he and the other driver worked for a transportation company that had paid them to transport the passengers. He stated that he himself and all of the passengers in the back of the van were illegal aliens.

An ICE agent then spoke to the other passengers in Spanish, asking for name and immigration status. The passengers all stated that they were from Mexico and were in the United States illegally. The passengers remained in the van until other ICE agents arrived, at which point they were handcuffed and transported to an ICE facility in Merrifield, Virginia, for processing. When the defendant's fingerprints were entered into the ICE Automated Fingerprint Identification System, it showed that he had been deported from Arizona the month before. ICE held the defendant and other passengers in administrative custody.

ICE agents interviewed the defendant on April 13, 2005, and on April 28, 2005. Before each interview, an ICE agent read the defendant *Miranda* warnings in Spanish, and the defendant indicated that he understood and waived his rights. In each interview, the defendant made a sworn statement that he had previously been deported and did not have permission to re-enter the United States.

On May 13, 2005, the defendant was arrested for unlawful re-entry after deportation, in violation of 8 U.S.C. § 1326(a). At a preliminary

hearing before a magistrate judge on May 17, 2005, the government mistakenly produced an individual named Francisco Almaraz Soriano, rather than the defendant, Francisco Soriano-Jarquin. At the time, no one alerted the court to the error. On the stand, ICE Special Agent Jason Fulton identified the individual present as Francisco Soriano-Jarquin, though upon cross-examination Fulton stated that he could not be sure the individual was Soriano-Jarquin. The judge found probable cause to hold Soriano-Jarquin.

On June 9, 2005, a grand jury indicted Soriano-Jarquin on one count of unlawful re-entry after deportation. On June 20, 2005, in a hearing in district court before the Honorable T.S. Ellis, III, counsel stated that the copy of the indictment sent to him referred to the defendant, Francisco Soriano-Jarquin, in the caption but referred to another individual, "Roberto Perez-Lopez," in the body of the indictment. Judge Ellis requested the copy of the indictment from the court's safe and found it to contain the same error.

The government later asserted that the error had originated in the U.S. Attorney's Office. A member of that office caught and corrected the error on the copy of the indictment that went to the grand jury, but failed to do so on the other copies. At the time of the June 20 hearing, the government had no explanation for the discrepancy and moved to dismiss the indictment without prejudice. Judge Ellis did so on June 23, 2005, and on the same day the grand jury returned a second indictment.

The defendant was arraigned before the Honorable James C. Cacheris on July 8, 2005, and on August 10, 2005, the parties appeared before Judge Cacheris on the defendant's motion to dismiss for lack of a speedy trial and to suppress evidence.

The defendant argued that, because his second indictment was returned more than thirty days after his May 13 arrest, dismissal was required under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.* The court rejected this contention, stating that the Speedy Trial Act required dismissal only where "*no* indictment or information is filed" within the requisite period, while in this case the first indictment was filed within the thirty days and dismissed without prejudice. *Id.* § 3162(a)(1) (emphasis added).

The defendant also moved to suppress all evidence obtained as a result of Trooper Ward's demand for the passengers' identification, because it violated the Fourth Amendment and the Equal Protection Clause of the Fourteenth Amendment. The court held that it did not violate the Fourth Amendment for an officer to ask passengers for identification where, as here, he did so for safety purposes and the questioning of the passengers did not prolong the stop. The court also rejected the defendant's equal protection claim.

On the scheduled trial date, August 22, 2005, defense counsel moved for a continuance. Defense counsel informed the government and the court for the first time that another individual, and not the defendant, had been present at the preliminary hearing. The defendant stated that he did not wish to receive a new preliminary hearing. Nevertheless, the defendant moved to dismiss on the ground that the denial of a preliminary hearing violated his Fourth and Fifth Amendment rights. This motion was subsequently denied by the court. Defense counsel also expressed an intention to call both Francisco Almaraz Soriano and ICE Special Agent Jason Fulton as witnesses in support of a misidentification theory of defense. Defense counsel asked for a continuance because he had as yet been unable to secure Francisco Almaraz Soriano. The court continued the trial until September 13, 2005.

Also on August 22, 2005, at the government's behest, the court ordered defense counsel to comply with the Department of Homeland Security ("DHS") Touhy regulations in calling ICE Special Agent Jason Fulton as a witness. Those regulations provide procedures for subpoenaing DHS employees and prohibit employees from testifying about information obtained on the job absent departmental authorization. *See* 6 C.F.R. §§ 5.41-.49 (2006). On September 7, 2005, however, the defense attempted to serve the government with a subpoena for Fulton that was not in compliance with the regulations. The government declined service, and defense counsel made no further attempts to secure Fulton as a witness. At trial, the district court excluded Fulton as a witness due to the defense's failure to comply with the Touhy regulations.

A jury trial occurred on September 13, 2005, and the jury returned a verdict of guilty on the single count of unlawful re-entry after

deportation, 8 U.S.C. § 1326(a). The defendant was sentenced to time served.

The defendant appeals his conviction on various grounds.

II.

Soriano-Jarquin argues first that the Fourth Amendment did not permit Trooper Ward to ask the passengers, including himself, for identification during the traffic stop. The defendant does not contest the initial traffic stop; rather, he contends that the stop did not give the police a legitimate basis to ask passengers for identification. That request, defendant argues, constituted a separate investigatory detention requiring reasonable suspicion of criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 20-21 (1968). Because the officer lacked reasonable suspicion, the defendant argues, the request constituted an unreasonable seizure in violation of the Fourth Amendment.

The Supreme Court recently held in *Brendlin v. California* that a passenger in a vehicle stopped by the police is seized by the stop within the meaning of the Fourth Amendment. 551 U.S. ___ (2007). As the Court in *Brendlin* explained, "[a] traffic stop necessarily curtails the travel a passenger has chosen just as much as it halts the driver. . . ." 551 U.S. at ___.

If a passenger is considered "seized" for Fourth Amendment purposes when a police officer makes a traffic stop, that passenger may then challenge the constitutionality of the actions taken during that stop. *See Brendlin*, 551 U.S. at ___. Here, that would include the officer's request for the passengers' identification.

We believe a simple request for identification from passengers falls within the purview of a lawful traffic stop and does not constitute a separate Fourth Amendment event. Assuming a lawful stop, an officer is entitled to some chance to gain his bearings and to acquire a fair understanding of the surrounding scene. Just as the officer may ask for the identification of the driver of a lawfully stopped vehicle, *see, e.g.*, *Delaware v. Prouse*, 440 U.S. 648, 659 (1979), so he may request identification of the passengers also lawfully stopped. No separate showing is required.

The Supreme Court has long held that ensuring officers' personal safety is of critical importance in the conduct of traffic stops. It is well established that officers performing a lawful stop are "authorized to take such steps as [are] reasonably necessary to protect their personal safety" thereafter. *United States v. Hensley*, 469 U.S. 221, 235 (1985).

For example, the Court noted in *Maryland v. Wilson*, 519 U.S. 408 (1997), that "a police officer may as a matter of course order the driver of a lawfully stopped car to exit his vehicle." *Id.* at 410 (citing *Pennsylvania v. Mimms*, 434 U.S. 106 (1977) (per curiam)). This safety interest attaches to officers' interactions with passengers as well as with drivers, because passengers may likewise present to officers who interrupt their journey a risk of personal harm. Because the "danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver in the stopped car," *Wilson*, 519 U.S. at 414, the Court held that they too could be ordered by the officer to exit a vehicle, *id.* at 410, 412.

If an officer may "as a matter of course" and in the interest of personal safety order a passenger physically to exit the vehicle, *id.* at 410, he may surely take the minimally intrusive step of requesting passenger identification. The failure of a vehicle's occupants to produce any sort of proper identification may heighten an officer's concerns (suggesting a possible need for backup), while the production of what appears to be a valid ID may serve to allay them. Indeed, both the Eighth and the Eleventh Circuits have recognized as much. The Eighth Circuit has held that an officer may request identification from both the driver and passengers as part of a valid traffic stop. *See United States v. Rodriguez-Hernandez*, 353 F.3d 632, 635 (8th Cir. 2003). Moreover, the Eleventh Circuit has made clear that during a valid traffic stop, a request for identification and a subsequent check of the occupants' criminal history constitute steps "reasonably necessary to protect [officers'] personal safety." *United States v. Purcell*, 236 F.3d 1274, 1277-78 (11th Cir. 2001). We do not require officers to make lawful stops at their peril. When an officer legitimately stops a vehicle, the identity of the persons in whose company the officer suddenly finds himself may be pertinent to the officer's well-being.

The request for passenger identification seems especially unobjectionable here. For one thing, it did not prolong the seizure. Indeed, the

Supreme Court has already held that police questioning that does not prolong a seizure does not provide a legitimate basis for a Fourth Amendment claim. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005). In this respect, this case resembles *Muehler v. Mena*, 544 U.S. 93 (2005). During a lawful search of a residence, police officers asked occupant Mena questions about her immigration status. *Id.* at 96. Mena contended that the questioning was an independent investigatory detention that, because the officers lacked reasonable suspicion, constituted a Fourth Amendment violation. *Id.* at 100. The Court held that, since Mena's questioning did not prolong her detention incident to the search, it was not "a discrete Fourth Amendment event," and thus "no additional Fourth Amendment justification for inquiring about Mena's immigration status was required." *Id.* at 101; *see also United States v. Photogrammetric Data Servs., Inc.*, 259 F.3d 229, 240 (4th Cir. 2001), *overruled on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004) (reasonable to detain and interview office employees during execution of valid search warrant).

In this case, Trooper Ward's request for identification did not prolong the stop, as it occurred while the police trainee checked the driver's license and registration and prepared his citations. While Trooper Ward did contact the ICE, which asked him to hold the vehicle for an administrative immigration inquiry, that contact came only after the driver of the van indicated that the passengers were illegal aliens. Because the request did not extend the stop, it did not alter its lawful character.

Moreover, the stopped vehicle had a broken headlight and a cracked windshield, and there was an unrestrained infant on the floor of the van. Given the eleven passengers in the vehicle, their high level of anxiety, and the number of obvious infractions, the drawbacks of defendant's claims about the officer's conduct are apparent.[1]

---

[1]Similarly, the defendant's contention that his *Miranda* warnings were "ineffective" lacks merit. The defendant does not specify in what way his warnings were ineffective. In fact, however, the defendant received effective warnings at the appropriate time. *Miranda* warnings are only required after the defendant is in custody. *See Illinois v. Perkins*, 496 U.S. 292, 297 (1990). The defendant was not in custody during his questioning at the roadside. *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)

### III.

Soriano-Jarquin also contends that he was entitled to dismissal owing to his failure to receive either a preliminary hearing or a timely indictment, in violation of the Fourth, Fifth, and Sixth Amendments. We review the district court's denial of this claim *de novo. See United States v. Pasquantino*, 305 F.3d 291, 294 (4th Cir. 2002).

### A.

The government concedes that the individual present at the defendant's preliminary hearing was not the defendant, Francisco Soriano-Jarquin, but another individual named Francisco Almaraz Soriano. The defendant argues that this error denied him a probable cause hearing in violation of his Fourth and Fifth Amendment rights.

This contention must fail. To begin with, the defendant did not challenge this defect in the preliminary hearing in a timely fashion. Federal Rule of Criminal Procedure 12(b)(3) provides that a motion alleging a defect in the preliminary hearing must be raised prior to trial. *See* Fed. R. Crim. P. 12(b)(3). Rule 12(c) provides that the court may set a deadline for such pretrial motions. *See* Fed. R. Crim. P. 12(c). In this case, the district court set a motions deadline of July 27, 2005. Nevertheless, the defendant did not raise the issue of mistaken identity by the motions deadline; he in fact did not raise the matter until the scheduled date of trial. While the defendant contends that he was entitled to use this issue at trial as part of an identity defense, this

---

(traffic stop not custodial); *United States v. Sullivan*, 138 F.3d 126, 130 (4th Cir. 1998) (same). After the defendant was taken into administrative custody, subsequent questionings were prefaced with a reading in Spanish of his *Miranda* rights, which he waived. These warnings were effective, the defendant's waivers were valid, and his two confessions to having re-entered the country after deportation are thus admissible.

We are also unpersuaded by defendant's Equal Protection claim. As noted above, the officer had ample objective basis for his actions, and defendant has advanced nothing to indicate a discriminatory animus was afoot.

in no way explains the four month delay in raising the issue or in complying with the rules.

Moreover, the defendant's indictment mooted any questions surrounding the preliminary hearing. This court has long held that the probable cause requirement may be satisfied either by a preliminary hearing or by indictment by a grand jury. *See United States v. Mackey*, 474 F.2d 55, 56-57 (4th Cir. 1973). Because both procedures aim "to insure the existence of probable cause before an accused is brought to trial," it has been a "long-standing rule that the return of an indictment by the grand jury eliminates the requirement of holding a preliminary hearing." *Id.* The grand jury indictment of Francisco Soriano-Jarquin thus rendered moot the confusion at the preliminary hearing.

The defendant nevertheless argues that the confusion at the preliminary hearing carried over to the grand jury proceedings. He contends that the grand jury indictment was somehow an indictment of Almaraz Soriano, rather than the defendant. The district court described this argument as "tenuous at best." The grand jury made its finding independently of anything that occurred at the preliminary hearing, on the basis of evidence pertaining exclusively to Soriano-Jarquin, including his previous deportation and his fingerprints in the ICE database. The district court thus concluded that "[t]he grand jury heard evidence regarding Soriano-Jarquin and returned an indictment naming him." Almaraz Soriano's presence at the preliminary hearing in no way affected the grand jury indictment. The defendant's motion to dismiss was properly denied.[2]

---

[2]The defendant's contention that he should be discharged pursuant to 18 U.S.C. § 3060(d) also lacks merit. The defendant relies on § 3060(d)'s provision that an arrested person who has not received a preliminary hearing in the requisite time, except as otherwise provided, shall be discharged without prejudice. *See* 18 U.S.C. § 3060(d) (2000). But § 3060 also provides that no preliminary hearing shall be required (1) if the defendant waives such a hearing, *see id.* § 3060(b), or (2) if an indictment is returned prior to a preliminary hearing, *see id.* § 3060(e). As noted above, the defendant delayed four months in raising his argument, a period that hardly seems consistent with any serious belief that he was somehow being improperly held. When he finally did raise the argument, the defendant stated that he waived a second hearing, and he had, in any case, already been indicted at that point. Even had a dismissal been required under § 3060(d), it would in any case have been without prejudice.

B.

The defendant next argues that his indictment violated his right to a speedy trial. The defendant was arrested on May 13, 2005, and first indicted on June 9, 2005. On June 20, 2005, it was discovered that copies of the indictment sent to defense counsel and placed in the district court's safe named the defendant in the caption but another individual in the body of the charge. While the defendant's name was correct on the copy presented to the grand jury, in the interest of caution the government moved to dismiss the indictment without prejudice and filed a new indictment on June 20, 2005. On June 23, 2005, the first indictment was dismissed without prejudice and the defendant re-indicted. The defendant claims that this indictment, more than thirty days after his arrest, violated his right to a speedy trial and that dismissal is required under the Speedy Trial Act, 18 U.S.C. § 3161 *et seq.*

The district court properly rejected this claim. 18 U.S.C. § 3161(b) requires that an indictment be filed within thirty days of arrest, while 18 U.S.C. § 3162(a)(1) provides that if "no indictment" is filed within that time limit, the charge must be dismissed. The district court correctly concluded that, under the plain language of the statute, § 3162(a)(1) applies to cases where "no" indictment was filed within the specified period. In this case, by contrast, the first indictment was filed within the thirty day period. Thus, automatic dismissal is not required under § 3162(a)(1).

In *United States v. Thomas*, 705 F.2d 709 (4th Cir. 1983), this court rejected the claim that a dismissal without prejudice and re-indictment violated the right to a speedy trial. The court held that the fact that a district court may dismiss a faulty indictment without prejudice "necessarily rebuts [the] argument that the timeliness of any subsequent indictment is to be measured by reference to the original arrest leading to the first, dismissed indictment." *Id.* at 710-11. The opposite outcome would necessarily make the dismissal "prejudicial in effect." *Id.* at 711.

This court has likewise held that the prohibition against delay "is designed (1) to protect against 'undue and oppressive incarceration prior to trial,' (2) to 'minimize anxiety and concern accompanying

public accusation,' and (3) to protect the 'ability of an accused to defend himself.'" *United States v. Goodson*, 204 F.3d 508, 515-16 (4th Cir. 2000) (quoting *Smith v. Hooey*, 393 U.S. 374, 378 (1969)). In this case, the district court properly found that the circumstances of the indictments did not interfere with these interests. As the charges in the first and second indictments were identical, the defendant received sufficient notice of the charges against him. Moreover, the second indictment was filed eight days after the end of the thirty day period allowed for the first indictment. The government expressed its willingness to proceed to trial on the original trial date of July 25, 2005, which was set at the first indictment. It was defense counsel who stated that a later trial date would be acceptable and who subsequently sought a continuance and a still later trial date. The district court thus properly concluded that the return of the second indictment more than thirty days after the defendant's arrest did not require dismissal.

The fact that defendant's claims are ultimately lacking in merit does little, however, to inspire confidence in the government's handling of the case. The defendant correctly observes that he found himself in an "improbable predicament" — confused with another man at his preliminary hearing and then called by yet another name in his indictment. While these mistakes were ultimately righted, in part by the government's own precautions in seeking a second indictment, the problems reflect a regrettable lack of care and attention with respect to this defendant's rights.

## IV.

Finally, the defendant challenges the district court's application of DHS Touhy regulations to the defense's attempt to call ICE Special Agent Jason Fulton as a witness. After the defendant failed to comply with the regulations in attempting to subpoena Fulton, the district court on the day of the trial granted the government's motion to exclude Fulton's testimony. The defendant claims that the application of the DHS regulations worked to deny his confrontation and compulsory process rights under the Sixth Amendment. We find that these contentions are without merit.

Pursuant to 5 U.S.C. § 301, federal agencies may promulgate so-called Touhy regulations to govern the conditions and procedures by

which their employees may testify about work-related issues at trial. *See United States ex rel. Touhy v. Ragen*, 340 U.S. 462, 468 (1951). The DHS Touhy regulations prohibit DHS employees from testifying about information obtained on the job absent departmental authorization. *See* 6 C.F.R. §§ 5.41-.49 (2006). They also provide that the DHS General Counsel alone may accept service on behalf of DHS employees. *See id.* § 5.43. The Supreme Court has approved such regulations, holding that agencies may legitimately promulgate regulations governing employee testimony and may, pursuant to those regulations, forbid an employee to testify in a court proceeding. *See Touhy*, 340 U.S. at 468.

The defendant claims at the outset that Touhy regulations do not apply to cases in which the United States is a party, but neither the authorizing statute, 5 U.S.C. § 301, nor the DHS regulations, 6 C.F.R. § 5.41, impose any such limitation. Moreover, other courts have applied Touhy regulations to the testimony of agency employees in federal criminal prosecutions. *See, e.g.*, *United States v. Wallace*, 32 F.3d 921, 929 (5th Cir. 1994) (applying Department of Justice Touhy regulations); *United States v. Allen*, 554 F.2d 398, 406 (10th Cir. 1977) (same).

Neither the existence nor the application of the Touhy regulations deprived the defendant of any right. To begin with, the defendant made no attempt whatsoever to comply with the DHS regulations. Given this, he can hardly be heard to complain that the regulations caused him injury. *See Wallace*, 32 F.3d at 929 (rejecting constitutional challenge where party did not comply with Touhy regulations); *United States v. Marino*, 658 F.2d 1120, 1125 (6th Cir. 1981) (same).

In any case, his constitutional claims must fail. There was no violation of the Confrontation Clause, because the confrontation right pertains only to adverse witnesses offering testimony at trial. *See, e.g.*, *Crawford v. Washington*, 541 U.S. 36, 51 (2004). In this case, the government neither called Fulton as a trial witness nor introduced any statements by him. The right to compulsory process was also not violated, not only because the Supreme Court has upheld the Touhy regulations as a valid enactment but also because Fulton's testimony was wholly peripheral to the defendant's case. *See United States v. Valenzuela-Bernal*, 458 U.S. 858, 867 (1982) (violation of compul-

sory process occurs only when "the defendant [i]s arbitrarily deprived of 'testimony that would have been *relevant* and *material*, and . . . vital* to the defense.'") (quoting *Washington v. Texas*, 388 U.S. 14, 16 (1967)). Fulton's testimony at most went to the question of the preliminary hearing. It did not go to the sole issue at trial: whether the defendant had unlawfully re-entered the country after deportation. Thus no constitutional violation occurred, and the district court properly excluded Fulton's testimony.

V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED*.