RENDERED: MAY 28, 2020
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2018-SC-000680-MR

RODNEY CARLISLE, JR.                                   APPELLANT

V.                 ON APPEAL FROM KENTON CIRCUIT COURT
HONORABLE GREGORY M. BARTLETT, JUDGE
NO. 17-CR-01312

COMMONWEALTH OF KENTUCKY                        APPELLEE

**OPINION OF THE COURT BY JUSTICE KELLER**

**<u>AFFIRMING</u>**

Rodney Carlisle, Jr., appeals as a matter of right from a circuit court judgment convicting him of three counts of first-degree trafficking in a controlled substance for which he was sentenced to a total of twenty years' imprisonment. Carlisle argues the trial court should have suppressed evidence that was found on his person during a warrantless search because it was the result of illegal searches and seizures. Finding no error in the trial court's refusal to suppress this evidence, we affirm the judgment.

# I. BACKGROUND

## A. The Initial Traffic Stop

In September 2017, at approximately 3:10 PM,[1] Officer Brian Powers of the Covington Police Department stopped a truck for improper equipment, namely, tinted taillights and a loud exhaust. The truck was driven by Christopher Hughes; Carlisle was the only passenger. Two other officers, Sergeant S. Mangus and Officer Kyle Shepard, arrived on the scene to assist Officer Powers.

The traffic stop was captured on Officer Powers's body cam. The video shows that Officer Powers first approached the driver's side window and explained why he had stopped the truck. He then asked where Hughes and Carlisle were coming from, where Hughes lived (Newport), where the two were headed, where exactly Hughes was staying in Newport, and why they were so far from Newport. Hughes explained that he was living with someone in Newport but was helping someone move nearby, and he was headed to Sunoco for gas. Officer Powers then collected Hughes's license and, while Hughes searched for proof of insurance, also collected Carlisle's identification card. He also asked Hughes if he had ever been arrested, and Hughes responded yes, for possession of drug paraphernalia in 2001.

---

[1] The body camera recording indicates that the stop occurred at approximately 19:10:40, or 7:10 p.m. However, based on testimony at the suppression hearing and the time indicated on the uniform citation, the stop occurred at 3:10 p.m. We have adjusted the relevant timestamps to track this time.

Officer Powers returned to his cruiser, immediately commenting "shady" to his own passenger. (It is unclear who this passenger is or why he was riding along.) He noted that the computer was running slowly. He also commented that he would "see if they got any prior charges." As he attempted to run Hughes's license number, he commented to his passenger, "We'll see if we can search the car, I don't know if he's gonna allow us to." He had trouble running Hughes's license number because the license was damaged and some of the numbers were illegible, so he contacted dispatch for assistance. Dispatch eventually responded that Hughes's license was suspended.

Officer Powers returned to the driver's side window of the truck. He immediately returned the IDs and proof of insurance to Hughes. After handing back the IDs, Officer Powers explained that Hughes's license was suspended and that the license itself was so damaged that he would need to get a new one. At approximately 3:23:49, Officer Powers stated to Hughes, "So you can't leave, I'm not gonna cite you for it, but you can't leave. You gotta park your vehicle." Hughes responded, "Can I park it right here at Sunoco?" To this question, Officer Powers responded, "Yeah, that's fine, just park it out of the way, okay. Is there anything illegal in the vehicle at all?" This last question was asked at approximately 3:23:55. Hughes responded in the negative. Officer Powers asked, "No weapons, drugs, nothing like that?" Hughes responded that the only thing he had was a pocket knife. At 3:23:58, Officer Powers asked Hughes, "Mind if I take a look?" Hughes responded "no" at approximately 3:23:59, thereby consenting to a search of the truck.

## B. The Frisk and Detention of Carlisle

Hughes immediately exited the vehicle and was quickly frisked by Officer Powers. Officer Powers then directed Hughes to move toward the back of the truck where his supervisor was standing, "just wherever you want to stand with him." Carlisle was also instructed to exit the vehicle, at which point he was thoroughly frisked by Officer Shepard. The officer found a pocket knife, which he handed to Officer Powers. The officer also asked Carlisle how much cash he had on him. When the frisk was complete, Officer Powers directed Carlisle to "walk back over with my supervisor," at which point Carlisle walked over to one of the police cruisers parked behind the truck. The body cam shows that another officer pointed to the cruiser, at which point Carlisle sat down on the front of the cruiser. It is not clear if Carlisle was told that he had to sit there or only that he could sit there.

## C. The Search of the Truck

As Officer Powers began his search of the truck, he commented to one of the other officers that the passenger (Carlisle) was a convicted felon with a prior gun charge, and both men had prior drug charges. Officer Powers then focused his attention on a black drawstring backpack located in the passenger seat, resting against the middle console, while another officer began searching the driver's side. Officer Powers initially pulled two packages of unused syringes from the bag. At this point, he commented to the other officer that "it was under him so . . . ." The other officer asked if he was referencing the passenger, to which Officer Powers responded, "Yeah." As he continued to

4

search the bag, Officer Powers also found several cell phones. When the other officer mentioned that he would start looking through the seat cushions, Officer Powers commented, "It's gonna be on him." The other officer asked if the men had been searched yet, and Officer Powers responded that he had only patted them down, but "I think we got enough now to search." He also commented that "[Officer] Shepard patted this guy down, he's got a ton of money in his pocket."

Ultimately, the other officer found a digital scale in the driver's side door, and Officer Powers pulled from the bag an iPad, several cell phones, and a canister of butane, in addition to the syringes and various personal items like cologne, Tylenol, and an energy drink. In reference to the butane, Officer Powers commented, "Probably shooting meth." The other officer also asked what the butane was for, to which Officer Powers responded, "I've only ever seen that with meth."

Officer Powers then pulled the passenger seat up and picked up a plastic cellophane wrapper from the floorboard. Though it is not clear from his body cam footage, Officer Powers testified at the suppression hearing that there was a white residue on the wrapper. In the video, he stated that there was "at one point something in" the wrapper. In reference to the residue, he also stated, "I don't think there's gonna be enough to do anything with." He also stated, "If anything, it's gonna be on him, I'll check him."

## D. The Search of Carlisle's Person

Officer Powers then called dispatch to run the iPad's serial number to check if it was stolen. After doing that, he walked over to Carlisle. Officer Shepard, who had been standing with the men, handcuffed Carlisle, explaining that Carlisle had been acting "super nervous" and was "tensing up," so the officer did not "want to take any chances."

Officer Powers then searched Carlisle's person. He first checked the left pocket of his jeans and discovered a large amount of cash. He then asked Carlisle when he had last taken meth and whether he had any meth on him. Carlisle responded in the negative. Officer Powers then moved to Carlisle's right side and pulled from his waistband a small piece of plastic, apparently the top of a plastic baggie. Officer Powers finished searching Carlisle's pockets and found "suspected marijuana." He then attempted to find the rest of the plastic baggie and ultimately had Carlisle step of out his shoes and out of his jeans. Carlisle wore shorts underneath his jeans. The rest of the plastic baggie, which contained a suspected narcotic, was found after Carlisle stepped out of his jeans. Carlisle was read his *Miranda* rights, and the officers then continued to search him, shaking out his shorts and checking his socks and shoes.

After Carlisle was placed in the back of the police cruiser, the officers quickly searched Hughes and, finding nothing, allowed him to leave. Carlisle was ultimately transported to booking, at which point the body cam footage ended.

### E. Motion to Suppress

Carlisle moved to suppress all evidence from the traffic stop, and a hearing was held in which only Officer Powers testified. The body cam footage was also submitted as an exhibit. The trial court ultimately denied the motion. The case proceeded to trial, and a jury found Carlisle guilty of three counts of first-degree trafficking in a controlled substance. Carlisle was sentenced to a total of twenty years of imprisonment, and this appeal followed.

## II.    ANALYSIS

Carlisle argues that the trial court erred in denying his motion to suppress because (1) Officer Powers illegally extended the traffic stop beyond its original purpose; (2) the continued detention of Carlisle after the traffic stop concluded constitutes an illegal seizure; and (3) the officers did not have probable cause to search Carlisle's person. We address each argument in turn.

### A. Prolonged Stop

Carlisle first argues that Officer Powers illegally extended the duration of the traffic stop beyond its original lawful purpose, thereby illegally seizing Carlisle. In his brief to this Court, Carlisle focuses on the questions that Officer Powers asked when he first approached the truck (e.g., where do you live, where are you going) and his search of their criminal histories.

On this issue, the parties both cite to *Rodriguez v. United States*, 575 U.S. 348 (2015). In that case, Rodriguez's car swerved onto the shoulder of the road, in violation of a law prohibiting driving on the shoulder. An officer stopped the car and ultimately wrote a written warning ticket. The officer

explained the warning to Rodriguez and handed back to Rodriguez and his passenger the documents obtained from them. The officer later testified that "I got all the reason[s] for the stop out of the way[,] . . . took care of all the business." Nevertheless, the officer asked for permission to walk his dog around the vehicle. Rodriguez did not consent. The officer then instructed Rodriguez to exit the vehicle, and Rodriquez complied. The officer's dog conducted a sniff test and alerted to drugs. Approximately seven or eight minutes had elapsed from the time the officer issued the warning to the time the dog alerted to the presence of drugs.

> The Supreme Court of the United States held
>
> that a police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures. A seizure justified only by a police-observed traffic violation, therefore, "become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission" of issuing a ticket for the violation.

*Id.* at 350–51 (quoting *Illinois v. Caballes*, 543 U.S. 405, 407 (2005)). However, "[a]n officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop," but "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* at 355.

In reaching this conclusion, the Court affirmed its previous rulings in *Illinois v. Caballes* and *Arizona v. Johnson*, 555 U.S. 323 (2009). In *Caballes*, as noted above, the Supreme Court recognized that "[a] seizure justified only by a police-observed traffic violation . . . 'become[s] unlawful if it is prolonged beyond the time reasonably required to complete th[e] mission' of issuing a

8

ticket for the violation." *Rodriguez*, 575 U.S. at 350–51 (quoting *Caballes*, 543 U.S. at 407). In *Johnson*, the Court reaffirmed that "[t]he seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'" *Id.* at 355 (quoting *Johnson*, 555 U.S. at 333). However, in *Rodriguez*, the Court clarified that, while an officer "may conduct certain unrelated checks" during a traffic stop, "he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Id.* In other words, "[t]he critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff prolongs—i.e., adds time to—the stop." *Id.* at 357 (internal quotation marks omitted).

The Kentucky Supreme Court applied *Rodriguez* in *Davis v. Commonwealth*, 484 S.W.3d 288 (Ky. 2016). In that case, an officer observed Davis's car swerving across the center line and pulled him over. When he approached the car, the officer smelled alcohol and saw an open beer can in the console. Davis performed and passed two field sobriety tests, and a preliminary breath test registered no presence of alcohol. The officer then asked for permission to search the vehicle, but Davis did not consent. Nevertheless, over Davis's objection, the officer's canine performed a sniff test and alerted to drugs. This Court held that the fruits of that search should be suppressed. The Court first acknowledged that, under *Rodriguez*, "*any* prolonging of the stop beyond its original purpose is unreasonable and unjustified; there is no 'de minimis exception' to the rule that a traffic stop

9

cannot be prolonged for reasons unrelated to the purpose of the stop." *Id.* at 294. Applying that principle to the *Davis* case, the Court explained,

> The only reason for the sniff search was to discover illegal drugs in [Davis's] car, which adds nothing to indicate if the driver is under the influence and is clearly beyond the purpose of the original DUI stop. The evidence unequivocally established, and the Commonwealth agrees, that [the officer] had concluded his field sobriety investigation. It is obvious that his purpose then shifted to a new and different purpose. With no articulable suspicion to authorize an extended detention to search for drugs, [the officer] prolonged the seizure and conducted the search in violation of *Rodriguez* and [Davis's] Fourth Amendment protections.

*Id.*

In *Davis*, the lawful purpose of the stop had concluded. However, it is important to note that the key inquiry is not whether the stop is extended beyond its natural conclusion; rather, the Court must consider whether the officer's conduct (e.g., asking unrelated questions or conducting a sniff test) adds any amount of time to the stop. As the Supreme Court explained in *Rodriguez*, "[t]he critical question . . . is not whether the dog sniff occurs before or after the officer issues a ticket . . . but whether conducting the sniff prolongs—i.e., adds time to—the stop." 575 U.S. at 357 (internal quotation marks omitted); *see also Commonwealth v. Smith*, 542 S.W.3d 276, 282 (Ky. 2018) ("Obviously, the search added time to the stop because it was conducted before the purpose of the stop was addressed.").

With these principles in mind, it is helpful to break this analysis into distinct parts: First, was the traffic stop ongoing or had it concluded? Second, if the stop was ongoing, did Officer Powers inquire into matters unrelated to the

stop's mission? Third, if the officer inquired into unrelated matters, did his inquiries prolong the stop?

### i. The lawful traffic stop had not concluded at the time consent was obtained to search the truck.

Carlisle argues that Officer Powers extended the duration of the otherwise lawful traffic stop without the reasonable articulable suspicion necessary for that continued detention. As a threshold matter, then, the Court must determine if the lawful mission of the traffic stop concluded and if so, when.

On this point, the Supreme Court of the United States has explained, "Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave." *Johnson*, 555 U.S. at 333 (citation omitted). In *Rodriguez*, the Court also stated that "[a]uthority for the seizure ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." 575 U.S. at 354 (citation omitted). In addition, in *Nunn v. Commonwealth*, 461 S.W.3d 741 (Ky. 2015), this Court noted that the original purpose of a traffic stop had not concluded when the officer decided to impound the vehicle and waited for a tow truck to arrive. The fact that the officer and driver "were still waiting for the tow truck signifie[d] that the business for which the stop was justified was ongoing." *Id.* at 747.

Here, Officer Powers stopped Hughes's truck for faulty equipment, then learned that Hughes's license was suspended. Though he chose not to cite Hughes for these infractions, he needed to maintain control of the scene to ensure that Hughes did not continue to drive a vehicle with faulty equipment

11

and with a suspended license. In other words, he needed to maintain control of the situation until the vehicle was safely off the road and Hughes (and Carlisle) left the scene on foot or by other means. His continued control over the situation is demonstrated by his instruction to Hughes that he could not leave and would have to park his car, and Hughes's request for permission to park the truck at the Sunoco lot. *See Johnson*, 555 U.S. at 333–34 ("Nothing occurred in this case that would have conveyed to Johnson that, prior to the frisk, the traffic stop had ended or that he was otherwise free 'to depart without police permission.'" (citation omitted)). Under these circumstances, the lawful mission of the traffic stop had not concluded.

### ii. The officer did not inquire into matters unrelated to the stop's mission.

If the lawful traffic stop had concluded, then Officer Powers's continued detention of Hughes and Carlisle would be an illegal seizure, absent some independent basis for that seizure. However, because the traffic stop had not concluded, the Court must now consider whether it was prolonged beyond the time reasonably necessary to complete the mission of the stop. As the Supreme Court of the United States has explained, a police officer "may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez*, 575 U.S. at 355. Thus, in this case, the Court must first determine whether the officer inquired into matters unrelated to the purpose of the traffic stop.

12

In *Rodriguez*, the Supreme Court identified a number of tasks that it characterized as "ordinary inquiries incident to [the traffic] stop." *Id.* (quoting *Caballes*, 543 U.S. at 408) (internal quotation marks omitted). These inquiries include "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Id.* (citations omitted). The Supreme Court explained, "These checks serve the same objective as enforcement of the traffic code: ensuring that vehicles on the road are operated safely and responsibly. A dog sniff, by contrast, is a measure aimed at 'detect[ing] evidence of ordinary criminal wrongdoing.'" *Id.* (citations omitted). In other words, unrelated tasks are those "aimed at detecting criminal activity more generally." *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (interpreting *Rodriguez*).

In the present case, Carlisle focuses on the questions initially asked to Hughes, including where he lived and where the men were going and why. However, "[g]enerally, questions about travel plans are ordinary inquiries incident to a traffic stop." *United States v. Campbell*, 912 F.3d 1340, 1354 (11th Cir. 2019) (citations omitted). For example, in *Campbell*, an officer pulled over a vehicle with a malfunctioning taillight and proceeded to inquire into the driver's travel plans. The Eleventh Circuit first cited to various federal cases holding that questions related to a driver's travel plans are within the scope of a traffic stop. *Id.* The Eleventh Circuit then explained that, in that case, the questions were also relevant to the specific traffic violation; if the driver was traveling for a long distance, there was a greater chance that his taillight would malfunction

13

while he was on the road. *Id.* Similarly, in the present case, the questions about Hughes's travel plans would not only be an "ordinary inquiry" within the scope of the stop, they would also be relevant to the traffic violation for faulty equipment.

Carlisle also focuses on the officer's review of the men's criminal histories. As to whether a criminal history check extends the duration of a stop, the federal circuits are split. The Ninth Circuit, for example, has held that an "ex-felon registration check" was "wholly unrelated" to the traffic stop's mission of ensuring that vehicles on the road are operated safely and responsibly. *United States v. Evans*, 786 F.3d 779, 786 (9th Cir. 2015) (citations omitted). On the other hand, the Fourth Circuit has held that "an officer reasonably may search a computer database during a traffic stop to determine an individual's prior contact with local law enforcement, just as an officer may engage in the indisputably proper action of searching computer databases for an individual's outstanding warrants." *United States v. Hill*, 852 F.3d 377, 383 (4th Cir. 2017) (citations omitted); *see also United States v. Palmer*, 820 F.3d 640, 649 (4th Cir. 2016) ("An officer is entitled to conduct safety-related checks that do not bear directly on the reasons for the stop, such as requesting a driver's license and vehicle registration, or checking for criminal records and outstanding arrest warrants." (citing *Rodriguez*, 575 U.S. at 354–55)).

Like these federal cases, Kentucky case law fails to provide a clear answer to the question of whether or not a criminal records check prolongs an

14

otherwise lawful traffic stop. In *Moberly v. Commonwealth*, 551 S.W.3d 26 (Ky. 2018), the Court considered the question, but did not quite answer it. In that case, an officer pulled Moberly over after running his license plate number and discovering that the car's registration had been cancelled. The officer obtained Moberly's license and returned to his cruiser to write a citation; however, "[h]e also spent about five minutes accessing a jail website and a police database to find out more information about [Moberly]." *Id.* at 28. Moberly later argued that the officer's "legitimate mission—issuing traffic citations for the vehicle registration and insurance violations—was impermissibly extended without good cause when [the officer] diverted his attention from writing the traffic citation and spent several minutes searching online databases for information pertaining to [Moberly]." *Id.* at 30. This Court acknowledged "that *Rodriguez* identifies as one of the routine tasks associated with a proper traffic stop a check for any outstanding warrants that may be pending against the driver." *Id.* (citing *Rodriguez*, 575 U.S. at 355). In *Moberly*, however, it was not clear what "jail website" or "police database" the officer accessed, and he made no reference to outstanding warrants. "Nevertheless," the Court explained, "we will indulge in the presumption that at least a portion of the officer's time spent on the online sites can be justified as a check for outstanding warrants, although the Commonwealth does not assert as much. Faced with a silent record, we can presume no more." *Id.*

On this point, with no Kentucky case law on point, we find the analysis of the Georgia Supreme Court to be persuasive. That court addressed this very

15

issue two years after *Rodriguez* was rendered. In *State v. Allen*, 779 S.E.2d 248 (Ga. 2015), a police officer initiated a traffic stop and, about eight minutes into the stop, radioed for a computer records check on both the driver and passenger. *Id.* at 251. While the officer was awaiting a response, he conducted a dog sniff of the car and then conducted a search of the car based on the dog's positive alert. *Id.* The men moved to suppress the drug evidence found during the search on the grounds that the stop was unreasonably prolonged by the records check on the passenger. *Id.*

The court acknowledged that the records check was not related to determining whether to issue a traffic ticket to the driver, nor was there any indication that the passenger had committed a traffic violation himself. The records check was also not justified on roadway-safety grounds, as the passenger would not be driving away from the stop. *Id.* at 255. Thus, the court sought to determine whether the records check was "an officer safety measure that is ordinarily permitted as part of the mission of a traffic stop." *Id.*

The court ultimately concluded that running a computer records check is "squarely related to the officer's safety while completing the mission of the traffic stop." *Id.* at 256. The court explained,

> In allowing police officers, as a safety measure, to require
> passengers as well as drivers to get out of a stopped car, the
> Supreme Court explained, "[w]hile there is not the same basis for
> ordering the passengers out of the car as there is for ordering the
> driver out, the additional intrusion on the passenger is minimal."
> *Maryland v. Wilson*, 519 U.S. at 414–415, 117 S.Ct. 882. Similarly,
> while checking a passenger's identification may not always serve
> the combined roadway safety and officer safety objectives of
> checking the driver's identification, which is clearly permissible,

16

*see Rodriguez*, 135 S.Ct. at 1614–1615, it is a minimal additional intrusion that serves the weighty interest in officer safety. Indeed, many people would find providing their identification to a police officer for a computer records check far less intrusive than being ordered out of the car to stand on the shoulder of a busy highway or on the side of a street in their neighborhood. *See United States v. Soriano–Jarquin*, 492 F.3d 495, 500 (4th Cir.2007) ("If an officer may 'as a matter of course' and in the interest of personal safety order a passenger physically to exit the vehicle, he may surely take the minimally intrusive step of requesting passenger identification." (citation omitted)).

*Id.*

Finally, the Georgia Supreme Court noted that it had addressed this issue even before *Rodriguez* in its own case of the same name, *Rodriguez v. State*, 761 S.E.2d 19 (Ga. 2014):

Equally important, inquiring about the identities of [driver] Rodriguez and [passenger] Williams, inquiring about weapons in the car, verifying their identities, and checking for warrants are activities reasonably directed toward officer safety. Generally speaking, when an officer lawfully stops and detains an individual for a brief investigation[,] . . . the officer is entitled to take reasonable steps to make the scene safe for his investigation. As the United States Supreme Court has acknowledged, investigative traffic stops "are especially fraught with danger to police officers." Accordingly, the officer may take reasonable steps to ascertain whether the persons with whom he is dealing might be dangerous. To this end, courts throughout the country have held that an officer generally may reasonably inquire about the identities of persons detained at the scene of a traffic stop and take reasonable steps to quickly verify their identities and to check their criminal histories and for warrants.

*Allen*, 779 S.E.2d at 257 (quoting *Rodriguez*, 761 S.E.2d at 27–28). Accordingly, the *Allen* court held that the records check on the passenger "was an ordinary officer safety measure incident to the mission of the traffic stop, and it

17

therefore could permissibly extend the stop for a reasonable amount of time."
*Id.* at 258.

We find the reasoning of the Georgia Supreme Court compelling. "The Supreme Court has long held that ensuring officers' personal safety is of critical importance in the conduct of traffic stops." *United States v. Soriano-Jarquin*, 492 F.3d 495, 500 (4th Cir. 2007). For that reason, officers performing a traffic stop are "authorized to take such steps as [are] reasonably necessary to protect their personal safety and to maintain their status quo." *United States v. Hensley*, 469 U.S. 221, 235 (1985).

As such, we hold that an officer reasonably may ask for the identification and perform a criminal-records check of a driver and any passengers during an otherwise lawful traffic stop to determine an individual's prior contact with law enforcement. Such a task is an ordinary inquiry related to officer safety. Accordingly, Officer Powers's collecting of Carlisle's identification and subsequent checking of his criminal history was not an unrelated inquiry that prolonged the traffic stop.

In sum, we hold that the "travel plan" questions initially asked to Hughes were appropriate and related to the traffic stop's mission, and the inquiry into the men's criminal histories was also appropriate.[2] Each of these inquiries was

---

[2] One could conceivably argue that the questions asked to Hughes prior to the search of the truck—namely, the question of whether anything illegal was in the truck, like weapons, drugs, or similar items—were unrelated to the traffic stop's purpose and improperly prolonged the stop. However, that issue was not argued to the Court, and we therefore decline to address it.

related to the traffic stop's lawful purpose. As a result, we need not consider whether these inquiries prolonged the duration of the traffic stop by any length of time.

## B. Detention of Carlisle During Search of Truck

Carlisle next argues that, even if the stop was not unlawfully prolonged, he was illegally seized when he was ordered to exit the vehicle, patted down, told to stand over with another officer near the police cruisers, and then ordered to sit down on the police cruiser while the officers searched the truck. (As noted above, it is not clear that he was *ordered* to sit on the cruiser.)

It is well settled that a police officer may, as a matter of course, order the driver of a lawfully-stopped vehicle to exit the vehicle. In *Pennsylvania v. Mimms*, 434 U.S. 106 (1977), a driver, Mimms, was stopped for driving with an expired license plate. The officer asked Mimms to step out of the vehicle to produce his license and other documents, at which point the officer noticed a bulge in Mimms's jacket. Believing that the bulge could be a weapon, the officer frisked Mimms and recovered a gun. Mimms later moved to suppress the gun, arguing that the officer illegally seized him by ordering him out of the car.

In determining whether the officer's order to get out of the car was reasonable, the Supreme Court balanced the public interest in officer safety against the individual's right to be free from arbitrary police interference. *Id.* at 109. In weighing the public's interest in officer safety, the Court noted the state's interest in establishing a face-to-face confrontation with the driver during a traffic stop, thereby diminishing the possibility that the driver can

19

make unobserved movements and decreasing the risk of harm to the officer. *Id.* at 109–10. Against this interest, the Court weighed the intrusion into the driver's personal liberty occasioned by ordering him out of the vehicle. The Court observed that, because the driver's vehicle is already stopped, the additional intrusion of having him step out of the car is "de minimis." *Id.* at 111. The Court ultimately concluded that such an intrusion, which is "at most a mere inconvenience, cannot prevail when balanced against legitimate concerns for the officer's safety." *Id.* Accordingly, the Court held that "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable seizures." *Id.*

Later, in *Maryland v. Wilson*, 519 U.S. 408 (1997), the Court extended its holding in *Mimms* to passengers of lawfully stopped vehicles, using the same balancing test between public interest and personal freedom. *Id.* at 411. The Court explained that "the same weighty interest in officer safety is present regardless of whether the occupant of the stopped car is a driver or a passenger," as "traffic stops may be dangerous encounters." *Id.* at 413. On the personal-liberty side, the Court observed that "the case for passengers is in one sense stronger than that for the driver" because while "[t]here is probable cause to believe that the driver has committed a minor traffic offense, . . . there is no such reason to stop or detain the passengers." *Id.* Nevertheless, the Court explained that "as a practical matter, the passengers are already stopped by virtue of the stop of the vehicle. The only change that will result from ordering

20

them out of the car is that they will be outside of, rather than inside of, the stopped car." *Id.* at 413–14.

Moreover, the Court observed that placing the passenger outside of the car would deny him access to any possible weapon that might be concealed inside the car. *Id.* at 414. Furthermore, "the possibility of a violent encounter stems not from the ordinary reaction of a motorist stopped for a speeding violation, but from the fact that evidence of a more serious crime might be uncovered during the stop." *Id.* A passenger's motivation "to employ violence to prevent apprehension of such a crime is every bit as great as that of the driver." *Id.* The Court therefore held "that an officer making a traffic stop may order passengers to get out of the car pending completion of the stop." *Id.* at 415.

Notably, the *Wilson* court did not address the state's argument that an officer may order a passenger out of a vehicle *and* forcibly detain a passenger for the entire duration of the stop. However, applying the balancing test of *Mimms* and *Wilson*, we believe that the officer's safety concerns outweigh the passenger's personal liberty interests, thereby allowing an officer to detain a passenger during a traffic stop. For example, a departing passenger is likely to distract the officer's focus, thereby increasing the risk of harm to that officer. Thus, officers conducting a lawful search of a vehicle surely have an interest in securing passengers from wandering about the scene. The passenger, on the other hand, has already been seized by virtue of the traffic stop, so the continued intrusion upon the passenger is minimal. In this case, for example, Carlisle had already been stopped and detained by police while the ordinary

21

inquiries of the traffic stop were conducted, and the detention outside the vehicle lasted less than ten minutes. As such, the intrusion into Carlisle's personal liberty in this case was minimal. We therefore conclude that the officers' interest in safety in this case outweighed the intrusion into Carlisle's personal liberty, and his detention during the search of the truck was reasonable.

As for the officer's authority to frisk Carlisle for weapons, it is true that an officer must have reasonable articulable suspicion that the individual is armed prior to conducting a pat down under *Terry v. Ohio*, 392 U.S. 1 (1968). In this case, Officer Powers knew that Carlisle had a prior gun charge and Hughes had commented that he had a pocket knife. We need not address whether these sparse facts provided the necessary reasonable suspicion, however, because no evidence was obtained from the pat down.

### C. Search of Carlisle's Person

Lastly, Carlisle argues that the evidence discovered during the search of the truck failed to provide the probable cause necessary to search his person. We disagree and hold that the officers did have probable cause to search Carlisle's person.

This Court has previously explained, "In absence of consent, the police may not conduct a warrantless search or seizure without both probable cause and exigent circumstances." *Guzman v. Commonwealth*, 375 S.W.3d 805, 808 (Ky. 2012) (citing *Kirk v. Louisiana*, 536 U.S. 635, 638 (2002)). The test for probable cause is whether, under the totality of the circumstances, a fair

22

probability exists that contraband or evidence of a crime will be found in a particular place. *Moore v. Commonwealth*, 159 S.W.3d 325, 329 (Ky. 2005) (citation omitted). This Court has further explained that

> probable cause is a flexible, common-sense standard. It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false. A "practical, nontechnical" probability that incriminating evidence is involved is all that is required.

*Williams v. Commonwealth*, 147 S.W.3d 1, 7–8 (Ky. 2004).

The exigent circumstances doctrine, on the other hand, "arises when, considering the totality of the circumstances, an officer reasonably finds that sufficient exigent circumstances exist," thereby requiring "swift action to prevent imminent danger to life or serious damage to property, and action to prevent the imminent destruction of evidence." *Bishop v. Commonwealth*, 237 S.W.3d 567, 569 (Ky. App. 2007) (citations omitted) (internal quotation marks omitted). In narcotics cases, the exigent circumstances doctrine "is particularly compelling," as "contraband and records can be easily and quickly destroyed while a search is progressing." *United States v. Young*, 909 F.2d 442, 446 (11th Cir. 1990) (citation omitted).

In the present case, under the totality of the circumstances, the various items recovered in the search contributed probable cause to search both Hughes and Carlisle. The officers' search of the truck revealed a digital scale, a bottle of butane, several cell phones, two packages of syringes, and a cellophane wrapper covered in white residue. Officer Powers testified at the

suppression hearing that these items lead him to believe that the two men would have more paraphernalia on their persons. As he was searching the truck, he can also be heard commenting that he had "only ever seen" butane "with meth." In addition, during the frisk of Carlisle, Officer Shepard apparently felt a substantial amount of cash on Carlisle's person. Under the totality of these circumstances, there was probable cause to believe that Hughes and Carlisle held more contraband on their persons. *See generally Burton v. Commonwealth*, 2013-SC-000476-MR, 2014 WL 4160221 (Ky. Aug. 21, 2014) (holding that officer had probable cause to search entire vehicle once officer discovered ammonium nitrate in passenger compartment, combined with digital scales in plain view, and officer's knowledge of vehicle's occupants' prior drug charges); *Manns v. Commonwealth*, 2015-CA-001375-MR, 2016 WL 6819746 (Ky. App. Nov. 18, 2016) (holding that, under the totality of the circumstances, digital scales in plain view provided probable cause). Because there was a high likelihood that that contraband included narcotics, which could easily and quickly be destroyed, exigent circumstances also existed.

Notably, probable cause to search the driver of a vehicle does not automatically justify a search of a passenger in the same car. This is because

> [p]assengers in an automobile are not generally perceived to have the kind of control over the contents of an automobile as do drivers. Consequently, "some additional substantive nexus between the passenger and the criminal conduct must appear to exist in order for an officer to have probable cause to either search or arrest a passenger."

24

*Morton v. Commonwealth*, 232 S.W.3d 566, 570 (Ky. App. 2007) (quoting *State v. Wallace*, 812 A.2d 291, 304 (Md. 2002)). In this case, however, the officers discovered much of the evidence (the syringes, butane canister, and cell phones) in a backpack sitting in the passenger seat where Carlisle had been seated, and the wrapper with white residue was found behind the passenger seat. Furthermore, Officer Shepard had already discovered that Carlisle carried a substantial amount of cash on his person. The location of the evidence in the truck and the cash on Carlisle's person provided the necessary "substantive nexus" between Carlisle and the possible criminal conduct.

We therefore hold that the probable cause and exigent circumstances requirements were satisfied, thereby warranting a search of Hughes's person and, given the nexus between Carlisle and the evidence, Carlisle's person.

## III. CONCLUSION

For the reasons set forth above, we affirm the judgment of the Kenton Circuit Court.

All sitting. Minton, C.J.; Hughes, Lambert, VanMeter, and Wright, JJ., concur. Nickell, J., concurs in result only by separate opinion.

NICKELL, J., CONCURRING IN RESULT: I concur in result only. I remain troubled by Officer Powers' request to search because I believe the purpose of the traffic stop was completed relative to faulty equipment and driving on a suspended license. Officer Powers' request to search was unrelated to the original mission of the traffic stop. Further, securing the vehicle in the Sunoco parking lot could have been accomplished without a

search for drugs, weapons, or evidence of other crimes—and without prolonging the seizure absent reasonable and articulable suspicion of criminal activity. However, as noted by the majority, Carlisle did not raise the issue. As such, I am constrained to agree with the majority's resolution.


COUNSEL FOR APPELLANT:

Roy Alyette Durham II
Assistant Public Advocate


COUNSEL FOR APPELLEE:

Daniel Jay Cameron
Attorney General of Kentucky

James Daryl Havey
Assistant Attorney General